United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FACEBOOK, INC.,
Plaintiff,
v.
GLEB SLUCHEVSKY, et al.,
Defendants.

Case No. 19-cv-01277-JSC

**ORDER REASSIGNING AND REPORT AND RECOMMENDATION RE PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

Re: Dkt. No. 25

Facebook, Inc. filed suit against Gleb Sluchevsky and Andrey Gorbachov, alleging violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*; California's Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502; and various state law claims including breach of contract and fraud. (*See* Dkt. No. 1 ("Complaint").) The Clerk entered default against Defendants on March 13, 2020 after they failed to answer Plaintiff's complaint or otherwise appear in this action. (Dkt. No. 22.) Now before the Court is Plaintiff's unopposed motion for default judgment pursuant to Federal Rule of Civil Procedure 55(b)(2). (Dkt. No. 25.) Because the Court does not have the consent of the defaulting Defendants, the Clerk is ordered to reassign this action to a district court judge. *See Williams v. King*, 875 F.3d 500, 504 (9th Cir. 2017). The Court recommends that the newly-assigned district court judge grant Plaintiff's motion for default judgment.

**BACKGROUND**

**I. Complaint Allegations**

Plaintiff alleges that between 2016 and 2018 Defendants operated fraudulent third-party applications that "they made available on public websites, to deceive internet users into installing malicious extensions." (Complaint ¶ 31.) "Through these malicious extensions, Defendants scraped user data from social networking sites, including Facebook." (*Id.*) In the complaint,

Plaintiff seeks monetary and injunctive relief based on Defendants' conduct. Upon the Clerk's entry of default, the well-pleaded factual allegations in the complaint, except those concerning damages, are deemed to have been admitted by the non-responding party. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977). The Court thus accepts the following allegations as true.

**A. The Parties**

Plaintiff Facebook is a Delaware corporation with its principal place of business in Menlo Park, California. (Complaint ¶ 2.)

Defendants Gleb Sluchevsky and Andrey Gorbachov are individuals residing in Kiev, Ukraine. (*Id.* ¶ 3.)

**B. Defendants' Conduct**

Defendants used aliases to operate certain web browser applications from 2016 to 2018. (*Id.* ¶ 4.) During this time, Defendants operated and administered fraudulent third-party applications made available on public websites "to deceive internet users into installing malicious extensions." (*Id.* ¶ 31.) Through these malicious extensions, Defendants "scraped" user data from social networking sites, including Facebook. (*Id.*) Using the same malicious extensions installed by the app users, "Defendants were also able to inject unauthorized advertisements into app users' News Feed and into other views associated with various social networking sites." (*Id.*)

**II. Procedural History**

Plaintiff filed this complaint on March 8, 2019. (Dkt. No. 1.) Because Defendants reside in Ukraine, Plaintiff's case-initiating documents were then translated into Ukrainian and subsequently served under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 20 U.S.T. 361 (the "Hague Convention"). (Dkt. No. 19-3 ¶¶ 2-3.) On May 9, 2019, Plaintiff's Hague Convention service expert initiated the service process as required by the Hague Convention by sending all required documents to the Ministry of Justice of Ukraine ("Ministry of Justice"), which is Ukraine's Central Authority. (Dkt. No. 19-2 ¶ 9.) Plaintiff received confirmation that the Central Authority received all of Plaintiff's service documents on May 21, 2019. (*Id.* ¶ 10.) However, Plaintiff has not received certificates of service from the Ministry of Justice despite making "every reasonable

effort" to obtain such certificates. (*Id.* at ¶ 13(c).) Plaintiff sent courtesy copies of service documents to Defendants by e-mail and hand delivery. (Dkt. No. 19-3 at ¶ 3.) On August 13, 2019, Plaintiff sent a follow-up e-mail to all known e-mail addresses maintained by Defendants. (*Id.* ¶ 6.) On August 14, 2019, an attorney for Mr. Sluchevsky contacted Plaintiff's counsel stating that he had been retained to represent Mr. Sluchevsky. (*Id.* at ¶ 7.) Plaintiff's counsel then served Mr. Sluchevsky's attorney with all documents filed in this action, but the attorney stated that Mr. Sluchevsky did not authorize him to appear in the action or accept service. (*Id.*) Plaintiff's counsel states that Plaintiff has not received a response from Mr. Gorbachov; however, Mr. Sluchevsky's attorney stated that Mr. Gorbachov had "actual knowledge" of the action. (*Id.*)

After serving Defendants in compliance with the Hague Convention, and failing to receive a confirmation or certificate of service from the Ministry of Justice of Ukraine, Plaintiff filed a motion for entry of default against Defendants on March 12, 2020. (Dkt. No. 19.) The Clerk of Court entered default as to Defendants the next day. (Dkt. No. 22.) Plaintiff filed this motion for default judgment on July 9, 2020. (Dkt. No. 25.)

## DISCUSSION

### I. Jurisdiction

District courts have an affirmative duty to examine their jurisdiction—both subject matter and personal jurisdiction—when default judgment is sought against a non-appearing party. *See In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).

#### A. Subject Matter Jurisdiction

The Court has federal question jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claim for violation of the CFAA, and supplemental jurisdiction over the state law claims alleged in the complaint under 28 U.S.C. § 1367 because these claims emerge from the same nucleus or set of operative facts as Plaintiff's federal cause of action.

#### B. Personal Jurisdiction

##### 1. Forum Selection Clause

A defendant may consent to a court's personal jurisdiction through a forum selection clause, provided the defendant "agrees to be so bound." *Holland Am. Line Inc. v. Wartsila N. Am.,*

*Inc*., 485 F.3d 450, 458 (9th Cir. 2007) (citations omitted). "[F]orum selection clauses can be equally applicable to contractual and tort causes of action." *Manetti-Farrow, Inc. v. Gucci Am., Inc*., 858 F.2d 509, 514 (9th Cir. 1988) (citation omitted). Forum selection clauses are to be specifically enforced unless the party opposing the clause clearly shows "that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Id.* at 512 (internal quotation and citation omitted). "Courts routinely uphold forum selection clauses in form contracts between consumers and businesses." *Thomas v. Facebook, Inc*., No. 118CV00856LJOBAM, 2018 WL 3915585, at *4 (E.D. Cal. Aug. 15, 2018) (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 587 (1991)).

Regarding Facebook's forum selection clause, courts have held that its terms are not fraudulent or overreaching, that its enforcement would not deprive a litigant "her day in court," that it does not contravene public policy, or that it otherwise "does not comport with fundamental fairness." *Id.* (citation omitted); *see also Franklin v. Facebook, Inc*., No. 1:15-cv-00655-LMM, 2015 WL 7755670, at *2 (N.D. Ga. Nov. 24, 2015); *Fteja v. Facebook, Inc*., 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012). While Plaintiff has not provided the Court with the clause's exact language, the Court finds the language regarding the clause in the complaint—that it requires Defendants to "submit to the personal jurisdiction of [this Court] for litigating any claim, cause of action, or dispute with Facebook"—to be similarly inoffensive to public policy and fundamental fairness. Furthermore, the Terms of Service's ("TOS") prohibitions against unlawful conduct, inauthentic accounts, misuse of users' identities through Facebook's platform, and third-party developers' use of tools to deceive other users are not overreaching, do not deprive users access to their day in court, contravene any public policy, or fail to comport with fundamental fairness. (Complaint ¶¶ 18-23.) *See Thomas*, 2018 WL 3915585, at *4. Therefore, the Court finds that the forum selection clause in Plaintiff's TOS is valid.[1]

[1] *Cf. Facebook, Inc. v. Rankwave Co*., No. 19-CV-03738-JST, 2019 WL 8895237, at *3 (N.D. Cal. Nov. 14, 2019) (holding at the motion to dismiss stage that Facebook's forum selection clause was inapplicable to Facebook's claims against defendant not because it was "unreasonable or unjust," but because defendant contested the applicability of Facebook's South Korean Terms of Service to an action brought by Facebook.) Unlike *Rankwave*, this action comes before the Court as a motion for default judgment, where the Court must take as true the allegation that non-appearing

Regarding Defendants' agreement to be bound to the terms of the forum selection clause, Defendants' use of Facebook constituted agreement to the TOS, including its forum selection clause. (Complaint ¶ 10.) Therefore, Plaintiff has sufficiently alleged that Defendants agreed to be bound by its terms that subject Defendants to the personal jurisdiction of this Court.

Having considered the relevant legal authority, Defendants' consent to this Court's personal jurisdiction under the forum selection clause in Plaintiffs' TOS, (Complaint ¶¶ 10, 18-23), and Defendants' failure to appear and contest the clause's enforcement, this Court finds it has personal jurisdiction over Defendants.

**2. Specific Personal Jurisdiction**

Regardless of the applicability of Facebook's forum selection clause, the Court has specific personal jurisdiction over Defendants.

For the court to exercise specific jurisdiction, the suit must arise out of or relate to the defendant's contacts with the forum state. *Bristol-Meyers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017). "In other words, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (internal quotations and citation omitted). Thus, "[s]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

The Ninth Circuit applies a three-part test to determine whether a defendant is subject to specific personal jurisdiction: first, a non-resident defendant must purposefully direct his activities or "consummate some transaction" with the forum or its residents, or "purposefully avail" himself of the privileges afforded for conducting activities in the forum, thereby invoking the benefits and protections of the forum's laws; the claim must arise from or relate to these forum-related activities; and the exercise of jurisdiction must be reasonable. *See Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1142 (9th Cir. 2017).[2] A plaintiff bears the burden of satisfying the test's first two

Defendants assented to the terms of the forum selection clause.

[2] The Ninth Circuit has said that "purposeful availment" and "purposeful direction" are "two

prongs, and if either goes unsatisfied personal jurisdiction over the defendant is not established. *Id.* (internal quotations and citation omitted). California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution. *See Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014); *see also* Cal. Code Civ. Proc. § 410.10 ("[A] court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."). California's jurisdictional statute is coextensive with federal due process requirements, and thus the jurisdictional analysis is the same. *Schwarzenegger*, 374 F.3d at 800-801.

**a. Purposeful Availment**

Parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (internal quotations and citations omitted). Regarding Defendants' purposeful availment, Plaintiff argues their assent to the choice-of-law provision in Facebook's TOS is relevant to the Court's jurisdictional analysis. *See Rankwave*, 2019 WL 8895237 at *5-6. Plaintiff also alleges that Defendants used Facebook maliciously to collect user information and that they maintained at least 13 Facebook accounts and 13 Facebook pages to effectuate their scheme. (Complaint ¶ 11.) The creation and use of each account required contracting with Plaintiff and agreeing to its TOS through the use of the account. At bottom, the ongoing obligations of both parties—"Facebook to allow [Defendants] to use its platform . . . and [Defendants] to comply with Facebook's policies regarding user data[]—constitute a continuous course of dealing . . . that suffices to make a prima facie showing of purposeful availment." *Rankwave*, 2019 WL 8895237, at *7 (internal quotations and citation omitted).

The Court finds Plaintiff has met its burden by showing and adequately alleging that the underlying controversy arises from Defendants' contacts with the forum through Defendants'

---

distinct concepts." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). The former applies to contract claims, and the latter to tort claims. *See Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015).

purposeful availment. The Court does not find the exercise of personal jurisdiction over Defendants would in this instance be unreasonable and, as such, that they are subject to specific personal jurisdiction on the basis of their purposeful availment of the forum and its privileges.

**b. Purposeful Direction**

"Purposeful direction" exists when a defendant commits an intentional act expressly aimed at a forum that causes harm the defendant knows is likely to be felt and suffered in that forum. *See Calder v. Jones* 465 U.S. 783, 788-89 (1984); *see also Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (adopting the *Calder* "effects" test).

Plaintiff argues that Defendants purposefully directed their harmful conduct at California. The Court agrees. Defendants' use of the malicious extensions, scraping of Facebook users' data, and placing unauthorized advertisements onto users' News Feeds constitute the requisite intentional acts. (Complaint ¶¶ 31-43.) Plaintiff's principal place of business is in California, and over 37,000 Facebook users in California installed and were subject to Defendants' fraduluent applications. (Dkt. No. 25-2 ("Wleklinksi Declaration") at 2.) Plaintiff was required to investigate Defendants' conduct, and spent over $75,000 investigating and remediating the damage done by Defendants. (Complaint ¶¶ 44-45.) Plaintiff's expenditure of these resources at its headquarters in California underscores the harm Defendants inflicted in the forum state. *See Dole Food Co. v. Watts*, 303 F.3d 1104, 1113 (9th Cir. 2002) ("[A] corporation can suffer economic harm both where the bad acts occurred and where the corporation has its principal place of business."); *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1053 (N.D. Cal. 2010) (holding that defendants purposefully directed their conduct at California after "taking [] into consideration" that "[p]laintiff is headquartered in California and maintains its website in California, [d]efendants' actions directly targeted California, and [d]efendants knew that Plaintiff would suffer the brunt of its harm in California.") (citation omitted).

Therefore, the Court finds that Plaintiff has met its burden to show that Defendants purposefully directed intentional acts whose harms Plaintiff suffered at California. This provides a sufficient basis for establishing specific personal jurisdiction over Defendants.

**II. Service**

The Court must additionally ensure that "the procedural requirement of service of summons" has been satisfied. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999) (noting that "one becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure.") (citing Fed. R. Civ. Proc. 4(a)). Federal Rule of Civil Procedure 4(f)(1) permits an individual to be served outside the United States "by any internationally agreed means of service that is reasonably calculated to give notice," including those means "authorized by the Hague Convention[.]"

The Hague Convention requires plaintiffs to forward requests for service of process to the central authority of the defendant's home country. *See* Hague Convention, art. III. "The Hague Convention permits default judgement against a foreign party once three elements have been satisfied, even if the foreign party did not actually receive a copy of the summons and complaint." *Meemic Ins. Co. v. Vertical Partners W., LLC*, No. 18-CV-11603, 2019 WL 4928806, at *2–3 (E.D. Mich. Oct. 6, 2019) (citing Hague Convention, art. XV). These require: (1) that the document was transmitted by a method provided for in the Hague Convention; (2) that a period of time "not less than six months, considered adequate by the judge in the particular case, has elapsed since the date of the transmission of the document;" and (3) "that no certificate of any kind has been received, even though every reasonable effort has been made to obtain it through the competent authorities of the State addressed." Hague Convention, art. XV. Applying this framework, the *Meemic* court held that the Chinese government's failure to provide its plaintiff with a certificate of service after confirming receipt of service, coupled with a year's passage and the plaintiff's "every reasonable effort" to serve, satisfied the Hague Convention's requirements for default judgment. *Meemic*, 2019 WL 4928806, at *3.

Similarly, Plaintiff served Defendants in compliance with the Hague Convention over a year ago on May 9, 2019, after which Plaintiff received a confirmation of the Ministry's receipt on May 21, 2019. (Dkt. No. 19-2 ¶¶ 9-10.) Plaintiff, as required by the Hague Convention, served upon the Ministry of Justice Ukranian translations of the summons, complaint, and additional case-related filings. (*Id.* ¶ 9.) Plaintiff's Hague Convention service specialist has contacted the

Ministry of Justice four times—September 10, 2019; November 5, 2019; December 23, 2019; and February 14, 2020—regarding the status on this service and, despite these reasonable efforts, has received no certificate of any kind from the relevant Ukrainian authorities. (*Id.* ¶ 13(c).) As in *Meemic*, 2019 WL 4928806, at *3, the Court finds that these facts establish Plaintiff's service efforts complied with the Hague Convention and that, under it, a default judgment may be entered.

**III. Default Judgment**

The Court now turns to the appropriateness of entering a default judgment against Defendants pursuant to Federal Rule of Civil Procedure 55(b). Pursuant to Federal Rule of Civil Procedure 55(b), a district court may grant default judgment after the Clerk's entry of default. "The district court's decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Courts consider the following factors in determining whether to enter a default judgment: "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action[,] (5) the possibility of a dispute concerning material facts[,] (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). Here, consideration of the *Eitel* factors weighs in favor of granting default judgment.

**A. Possibility of Prejudice to Plaintiff**

The first *Eitel* factor considers whether the plaintiff will suffer prejudice if the court denies default judgment. *See Craigslist, Inc. v. Naturemarket, Inc*., 694 F. Supp. 2d 1039, 1054-55 (N.D. Cal. 2010). In *Craigslist*, the court found that denial of the plaintiff's request for judgment and injunctive relief would leave the plaintiff "prone to continued circumvention of its security measures" by defendants, and that, on this basis, "failure to enter judgment would cause substantial harm to [the plaintiff.]" *Id.* The court finds *Craigslist* to be factually similar and its reasoning persuasive. Similarly, here Plaintiff will be unable to prevent Defendants from further violating its TOS or engaging in other disruptive conduct unless the Court grants its motion. This fact favors granting default judgment under the first *Eitel* factor.

**B. Merits of Claims and Sufficiency of Complaint**

The second and third *Eitel* factors require the plaintiff "to plead facts sufficient to establish and succeed upon its claims." *Craigslist, Inc*., 694 F. Supp. 2d at 1055. As previously discussed, on a motion for default judgment the well-pleaded factual allegations in the complaint, except those concerning damages, are deemed to have been admitted by the non-responding party. *See Geddes*, 559 F.2d at 560. At this stage, "[t]he district court is not required to make detailed findings of fact." *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).

Plaintiff's first claim is for various violations of the CFAA, 18 U.S.C. § 1030 *et seq*. Section 1030(a)(4) requires a plaintiff to allege that defendant (1) accessed a "protected computer," (2) without authorization or exceeding such authorization that was granted, (3) "knowingly" and with "intent to defraud," and thereby (4) "further[ed] the intended fraud and obtain[ed] anything of value," causing (5) a loss to one or more persons during any one-year period aggregating at least $5,000 in value. *See* 18 U.S.C. § 1030(a)(4); *see also Facebook, Inc. v. Grunin*, 77 F. Supp. 3d 965, 971 (N.D. Cal. 2015) (citation omitted).

To state a claim under 18 U.S.C. § 1030(a)(5)(A), Plaintiff must allege that Defendants "knowingly cause[d] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause[d] damage without authorization, to a protected computer."

To state a claim under §§ 1030(a)(5)(B) and (C), Plaintiff must allege that Defendants intentionally accessed a protected computer without authorization, and as a result of such conduct, caused damage or recklessly caused damage or loss. 18 U.S.C. §§ 10(a)(5)(B)-(C); *see also Craigslist, Inc.*, 694 F. Supp. 2d at 1057.

Regarding Plaintiff's allegation that Defendants violated § 18 U.S.C. 1030(b), proscribing conspiracies to commit or attempt to commit a violation under § 1030(a), courts have interpreted the statute to reach civil actions, *see Genentech, Inc. v. JHL Biotech, Inc*., No. C 18-06582 WHA, 2019 WL 2476617, at *4 (N.D. Cal. June 13, 2019) (citation omitted), and requiring allegations of "an agreement and common activities[,]" *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 835 (N.D. Cal. 2014) (citations omitted). *See also In re: Lenovo Adware Litig.*, No. 15-MD-

02624-RMW, 2016 WL 6277245, at *6 (N.D. Cal. Oct. 27, 2016) (holding that § 1030(b) created civil as well as criminal liability and requires "specific allegations of an agreement and common activities.") (citations omitted).

Under the CFAA, a computer used in interstate commerce is defined as a "protected computer." 18 U.S.C. § 1030(e)(2)(B).

Here, Plaintiff adequately pleaded a claim for these various statutory violations of the CFAA. First, Plaintiff established that its HTTP servers were used in interstate commerce, and that they therefore qualify as protected computers. (Complaint ¶ 49.) Second, Plaintiff alleged that Defendants intentionally and with the intent to defraud used malicious extensions and Java Script code to access and scrape Facebook's HTTP servers without authorization, and that they also accessed, without authorization, "compromised users' News Feeds, to run unauthorized ads." (*Id.* ¶ 50.) Furthermore, Defendants sent unauthorized commands through the malicious extensions that purported to originate from Facebook users. (*Id.* ¶ 51.) Defendants' unauthorized and intentional use of these extensions to further their fraudulent data harvesting operation, (*Id.* ¶ 51), satisfies the requirements of § 1030(a)(4).

The harm Defendants knowingly caused with the transmission of these extensions that resulted in intentional damage to Facebook's protected computers satisfies the requirements of § 1030(a)(5)(A). These facts, taken together, similarly satisfy the requirements of § 1030(a)(5)(B) and (C), in that Defendants' intentional, unauthorized and reckless conduct caused damage to Facebook's protected computers. Finally, as required under § 1030(a)(4) and § 1030(a)(5)(C)'s loss requirement, Plaintiff sufficiently pleaded that Defendants' actions caused it to incur losses and economic damages that exceed $5,000. (*Id.* ¶¶ 56-58.)

Regarding Plaintiff's claim under Section 1030(b), while Plaintiff alleges that "each Defendant was the agent, servant, employee, partner, alter ego, subsidiary, or coconspirator of and with the other . . . and the acts of each . . . were in the scope of such relationship," this does not allege any underlying agreement that gave rise to their allegedly conspiratorial relationship. (Complaint ¶ 6.) While Plaintiffs allege that Defendants acted with the consent of each other, (*Id.*), and elsewhere that they conspired to commit violations of § 1030(a), these allegations

describe the nature of Defendants' relationship rather than any originating agreement between them. Accordingly, even taking Plaintiff's allegations as true, Plaintiff has failed to allege facts sufficient to show the requisite agreement existed between Defendants to establish liability under § 1030(b).

In its second claim, Plaintiff alleges violations of California's Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502(c)(1), (3), (5), (7), (9). These provide that any person who does any of the following is guilty under the statute:

> (1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.
>
> (3) Knowingly and without permission uses or causes to be used computer services.
>
> (5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.
>
> (7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.
>
> (9) Knowingly and without permission uses the internet domain name or profile of another individual, corporation, or entity in connection with the sending of one or more electronic mail messages or posts and thereby damages or causes damage to a computer, computer data, computer system, or computer network.

Plaintiff has sufficiently stated a claim under California Penal Code § 502(c). Regarding subsection (c)(1), Plaintiff has alleged sufficient facts to show that Defendants knowingly accessed without permission and damaged Plaintiff's computer network. (Complaint ¶¶ 51, 60.) Under subsection (c)(3), Plaintiff has shown that Defendants knowingly and without permission used computer services by using malicious extensions, scraping Plaintiff's HTTP server data, and running unauthorized ads. (*Id.* ¶¶ 49-50.) These same facts establish Defendants' liability under subsection (c)(5). Plaintiff's allegation that Defendants' use of the malicious extensions and Java Code to access and scrape data from Plaintiff's HTTP servers without authorization sufficiently states a claim under subsection (c)(7). Regarding subsection (c)(9), the placement of unauthorized

advertisements through users' News Feed satisfies its requirements. (*Id.* ¶ 51.)

Regarding Plaintiff's third claim, to plead a claim for breach of contract a Plaintiff must allege facts sufficient to show: (1) a contract; (2) plaintiff's performance; (3) defendant's breach; and (4) damages to plaintiff. *Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1352 (2009). Agreeing to Facebook's TOS by creating a Facebook account and accessing Facebook's services created a contract between Plaintiff and Defendants. (Complaint ¶ 18.) *See also Grunin*, 77 F. Supp. 3d at 970 (sustaining a breach of contract claim where the defendant "agreed to Facebook's Terms when he created a Facebook account and accessed Facebook's services."). The TOS prohibit fake and inauthentic accounts, unlawful and fraudulent conduct, users' misrepresentation of their identities, or third-parties' deception of other users. (Complaint ¶¶ 19-22.) Between 2016 and 2018, Defendants knowingly made aliases on Facebook to use the website's services, and used fraudulent applications to scrape data from other Facebook users without the users' consent. (*Id.* ¶¶ 33-41.) This sufficiently establishes Defendants' breach of Plaintiff's TOS. Because Plaintiff upheld its performance by allowing Defendants to use its website and itself complied with the TOS, and Plaintiff has incurred damages as a result of Defendants' breach, (*Id.* ¶ 45), Plaintiff has sufficiently stated a claim for breach of contract.

As for Plaintiff's fraud claim, to plead a fraud claim the complaint must allege sufficient facts to show: (1) a misrepresentation; (2) knowledge of the falsity; (3) intent to induce another's reliance on the misrepresentation; (4) justifiable reliance; and (5) resulting damages. *Grunin*, 77 F. Supp. 3d at 970. Fraud claims must meet Federal Rule of Civil Procedure 9(b)'s particularity requirement, *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003), which requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Here, Defendants knowingly and deliberately created fake developer accounts on Facebook, using knowingly false information and aliases in violation of Facebook's TOS. (Complaint ¶ 74.) Defendants intended for Plaintiff to rely on these knowing misrepresentations so Defendants could gain access to Facebook's platform. (*Id.*) Plaintiff justifiably relied on Defendants' misrepresentations, granting them access to Facebook's platform—access Plaintiff states it never would have granted "had it known of Defendants'

United States District Court
Northern District of California

undisclosed plan to use false information to open accounts [and] to scrape data[.]" (Dkt. No. 25 at 24.) Defendants further deceived Facebook users into installing malicious extensions, knowingly designed to appear as if they came from a legitimate Facebook user rather than a compromised browser. (Complaint ¶ 75.) Defendants intentionally deceived Plaintiff into using these malicious extensions and their misrepresented commands; Plaintiff reasonably relied on these misrepresentations and allowed Defendants to access users' friends lists and its HTTP servers. (*Id.*) Because Plaintiff has suffered economic injury as a result of Defendants' fraudulent conduct, (Complaint ¶¶ 44-47), the Court finds that Plaintiff has satisfied the heightened pleading standard of Rule 9(b) and sufficiently pleaded a claim of fraud against Defendants.

**C. Money at Stake**

Under the fourth *Eitel* factor, the Court must consider the amount of money at stake in relation to the seriousness of the defendant's conduct. *Eitel*, 782 F.2d at 1471-72. "Default judgment is disfavored where the sum of money at stake is too large or unreasonable in light of defendant's actions." *Tech. LED Intellectual Prop., LLC v. Revogi, LLC*, No. 18-CV-03827-JSC, 2019 WL 2716610, at *4 (N.D. Cal. June 27, 2019) (citation omitted). Conversely, default judgment may be appropriate where it is "tailored to [the defendant's] specific misconduct." *Bd. of Trs. v. Superhall Mech., Inc.*, No. C-10-2212 EMC, 2011 WL 2600898, at *2 (N.D. Cal. June 30, 2011).

Here, Plaintiff does not seek any monetary damages through its motion—it seeks injunctive relief only. (Dkt. No. 25 at 25.) Where a plaintiff seeks only injunctive relief, the fourth *Eitel* factor weighs in favor of granting the plaintiff's motion. *See MERSCORP Holdings, Inc. v. MERS, Inc*., No. 16-CV-04380-BLF, 2017 WL 1709351, at *3 (N.D. Cal. May 3, 2017) (holding that where plaintiffs "[did] not seek money damages" that the fourth *Eitel* factor weighed in favor of granting the motion).

**D. Dispute Over Material Facts**

There is no indication that the material facts are in dispute. Upon the Clerk's entry of default, Defendants were "deemed to have admitted all well-pleaded allegations" in the complaint. *See Geddes*, 559 F.2d at 560 ("The general rule of law is that upon default the factual allegations

of the complaint, except those relating to damages, will be taken as true.”). Further, evidence submitted by Plaintiffs in support of this motion—the declarations of Meghan Wleklinski and Steven E. Lauridsen—support Plaintiff's allegations. (*See* Dkt. Nos. 25-2, 25-3.) In the absence of any likely factual disputes, this factor weighs in favor of default judgment.

**E. Excusable Neglect**

“This factor favors default judgment where the defendant has been properly served or the plaintiff demonstrates that the defendant is aware of the lawsuit.” *Wecosing, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1082 (C.D. Cal. 2012). There is no basis here to conclude that Defendants' default resulted from excusable neglect. Plaintiffs complied with the Hague Convention's service requirements, and counsel for Mr. Sluchevsky stated that he and Mr. Gorbachov had actual notice of Plaintiff's lawsuit. (Dkt. No. 19-3 ¶ 7.) Plaintiff's counsel additionally e-mailed a copy of the entry of default to Mr. Gorbachov and Mr. Sluchevsky's attorney on July 9, 2020, and e-mailed both parties again concurrently with the filing of this motion. (Dkt. No. 25-3 ¶¶ 2-4.) Accordingly, this factor weighs in favor of default judgment.

**F. Policy Favoring Decision on the Merits**

“Cases should be decided on upon their merits whenever reasonably possible.” *Eitel*, 782 F.2d at 1472. This factor is not dispositive, however, and a defendant's failure to answer the complaint “makes a decision on the merits impractical, if not impossible.” *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). Thus, termination of a case before hearing the merits is permissible when a defendant fails to defend an action. *Id*. Given Defendants' failure to appear, a decision on the merits is impossible.

**IV. Remedy**

A default judgment cannot differ “in kind from, or exceed in amount, what is demanded in the pleadings.” Fed. R. Civ. Proc. 54(b). In its motion, Plaintiff clarifies it does not seek any monetary damages, and so the Court must determine the appropriateness of injunctive relief. Both the CFAA and CCDAF authorize injunctive relief as a remedy. *See* 18 U.S.C. § 1030(g); Cal. Penal Code § 502(e)(1). To obtain permanent injunctive relief, “[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such

as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The Court has discretion to grant or deny permanent injunctive relief. *Id.* The Court considers these factors in turn to determine if, on balance, they support issuing a permanent injunction against Defendants. The Court finds that they do.

**A. Irreparable Injury**

As in *Facebook, Inc. v. Power Ventures, Inc*., 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019), Facebook suffers harm on the basis of Defendants' violations of the CFAA and § 502. In *Power Ventures, Inc.*, defendants' unauthorized acquisition of "data to which [d]efendants h[ad] no lawful right" violated the CFAA and § 502, and this violative acquisition constituted irreparable harm. *Id.* Defendants' scraping of HTTP data and unauthorized use of Plaintiff's platform mirrors the defendants' unlawful acquisition of data in *Power Ventures, Inc.* On the basis of this factual similarity, the Court finds the reasoning in *Power Ventures, Inc.* persuasive, and determines that Plaintiff has shown it has suffered an irreparable injury under *eBay*'s first factor.

**B. Inadequacy of Money Damages**

Plaintiff has established that "remedies available at law, such as monetary damages, are inadequate to compensate" for the harm it has suffered regarding its ability to secure and control access to its servers and computer networks. *eBay*, 547 U.S. at 391. Plaintiff argues in its motion that absent injunctive relief, it is "very likely that Facebook will suffer irreparable harm again" because Defendants could continue to access Facebook's platform without authorization. (Dkt. No. 25 at 26.) Where defendants' conduct indicates there is a "reasonable likelihood of defendant's future violations," *Pyro Spectaculars North, Inc. v. Souza*, 861 F.Supp.2d 1079, 1092 (E.D. Cal. 2012), and defendants retain the software, tools or means at issue to continue their harmful behavior, this moves *eBay*'s second factor in favor of granting a permanent injunction. *See also Power Ventures, Inc.*, 252 F. Supp. 3d at 783. The Court agrees with other courts'

United States District Court
Northern District of California

movement of the second *eBay* factor toward granting a permanent injunction, given that, without its issuance, there is a reasonable likelihood of Defendants' continued, unauthorized use of Facebook's platform.

**C. Balance of Hardships**

Plaintiff has suffered harm because of Defendants' illegal conduct, and absent a permanent injunction face the probability of Defendants again engaging in similar conduct. In contrast, a permanent injunction would only require Defendants to comply with the law. This balance, therefore, weighs in favor of granting a permanent injunction. *See Power Ventures, Inc.*, 252 F. Supp. 3d at 784 (finding the third *eBay* factor weighed in favor of granting an injunction where it would "simply serve to force [defendants'] compliance with the law") (internal quotations and alterations omitted).

**D. Public Interest**

"The public has an interest in ensuring that computers are not accessed without authorization." *Power Ventures, Inc.*, 252 F. Supp. 3d at 785. Regarding Facebook specifically, courts have noted that "Facebook's ability to decisively police the integrity of its platforms is without question a pressing public interest." *Stackla, Inc. v. Facebook Inc.*, No. 19-CV-05849-PJH, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019). As such, the Court finds that a permanent injunction would advance a cognizable public interest, and that this factor weighs in support of enjoining Defendants' behavior.

**E. Injunction**

For the reasons discussed above, the Court finds that each of the factors supports granting a permanent injunction in this case. The Court therefore recommends the district court judge grant Facebook's request for permanent injunctive relief against Defendants. Specifically, the district court judge should enjoin Defendants and their agents, servants, employees, successors, and assigns, and all other persons acting in concert, conspiracy, or affiliation with Defendants from: soliciting, storing, and/or using Facebook login information from any current, past, or future Facebook user; accessing or attempting to access Facebook's website and computer system; creating or maintaining any Facebook accounts in violation of Facebook's TOS; engaging in any

United States District Court
Northern District of California

activity that disrupts, diminishes the quality of, interferes with the performance of, or impairs the functionality of Facebook's website; and engaging in any activity, or facilitating others to do the same, that violates Facebook's TOS, Community Standards, Platform Policy, or other related policy referenced.

**V. Attorneys' Fees and Costs**

Facebook seeks an award for its attorneys' fees and costs. California Penal Code § 502 permits a prevailing party to recover attorneys' fees. Cal. Penal Code § 502(e)(2) ("In any action brought pursuant to this subdivision the court may award reasonable attorney's fees."). *See, e.g.*, *Facebook, Inc. v. Power Ventures, Inc.*, No. 08-CV-05780-LHK, 2017 WL 3394754, at *6 (N.D. Cal. Aug. 8, 2017); *Swearingen v. HAAS Automation, Inc.*, 2010 WL 1495204, *2 (S.D. Cal. Apr. 14, 2010) ("[A]n examination of the history of § 502 reveals that it was the intention of the California legislature to allow only prevailing plaintiffs to recover attorney's fees.").

Facebook requests $80,529.00 in attorneys' fees, which Facebook claims is reasonable. (Dkt. No. 30 at 3.) The lodestar method is the appropriate method for evaluating the reasonableness of Facebook's attorneys' fees; "the lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011) (citation omitted). "Only in rare or exceptional cases will an attorney's *reasonable* expenditure of time on a case not be commensurate with the fees to which he is entitled." *Cunningham v. Cty. of Los Angeles*, 879 F.2d 481, 488 (9th Cir. 1988) (emphasis in original).

**A. Hourly Rates**

Facebook has filed a memorandum in support of its request for attorneys' fees and a supporting declaration from David J. Steele (the "Steele Declaration" or "Steele Decl."), attorney of record for Facebook. (Dkt. Nos. 30, 30-1.) These documents state that Partner Steele has approximately 20 years of intellectual property litigation experience, and billed 16.7 hours on the case at $685 per hours in 2019 and 10.1 hours at $710 per hour in 2020. (Steele Decl. ¶ 4.) Senior Associate Lauridsen has approximately 14 years of intellectual property litigation experience, and

billed 36.7 hours at a rate of $590 per hour in 2019 and 71.1 hours at a rate of $610 per hour in 2020. (*Id.* ¶ 5.) Junior Associate Janizeh has approximately four years of litigation experience and billed 2 hours at $335 per hour in 2019 and 1.2 hours at $360 per hour in 2020. (*Id.* ¶ 6.) Junior Associate Davidson, a first-year associate at the time she performed work in this action, billed 19.5 hours at a rate of $200 per hour. (*Id.* ¶ 7.)

The Court finds these rates are reasonable. The reasonableness of these hourly rates is supported by cases holding similar rates were reasonably within prevailing market rates. *See, e.g.*, *Nitsch v. DreamWorks Animation SKG Inc*., No. 14-CV-04062-LHK, 2017 WL 2423161, at *9 (N.D. Cal. June 5, 2017). In *Nitsch*, the court held that the case's lead attorneys' hourly rates of "$870 to $1,200 per hour" were reasonable under the lodestar method. *Id.* Here, Mr. Steele's hourly rates in 2019 and 2020, $685 and $710 respectively, fall within *Nitsch*'s approved window. (Steele Decl. ¶ 4.) Similarly, the remaining attorneys in *Nitsch* billed, and the court approved hourly rates, between "$275 to $750" per hour; here, the remaining hourly rates range from Mr. Lauridsen's 2020 rate at $610 per hour to Ms. Davison's rate at $200 per hour. (*Id.* ¶¶ 5-7.) Therefore, the Court finds that the hourly rates at issue for the attorneys in this action are reasonable based on the region's market and the attorneys' experience. *See also In re High-Tech Employee Antitrust Litig*., No. 11-CV-02509-LHK, 2015 WL 5158730, at *9 (N.D. Cal Sept. 2, 2015) (holding that billing rates for partners in the range of $490 to $975 per hour and rates of non-partner attorneys in the range of $310 to $800, "with most under $500" were reasonable).

**B. Hours Billed**

Having determined the rates at which Plaintiff was billed in this action are reasonable, the Court must determine whether "the number of hours expended litigating this matter was reasonable in light of the work performed and the context of the case." *Craigslist, Inc. v. Doe 1*, No. C09-4739 SI BZ, 2011 WL 1897423, at *7 (N.D. Cal. Apr. 25, 2011), *report and recommendation adopted sub nom. Craigslist, Inc. v. Meyer,* No. C 09-4739 SI, 2011 WL 1884555 (N.D. Cal. May 18, 2011) (citation omitted).

Based on the hours reported in the Steele Declaration, the attorneys spent 157.3 total hours litigating this matter. (Steele Decl. ¶¶ 4-7.) This work, according to Plaintiff's counsel, included:



United States District Court
Northern District of California

researching and investigating Defendants; researching and drafting the complaint, (Dkt. No. 1); attempting service through the Hague Convention, (*see* Dkt. No. 19-2); communicating with Mr. Sluchevsky's attorney to obtain a waiver of service, to meet and confer pursuant to Rule 26(f), and to attempt to settle the action; drafting several filings to continue the case management conference in this action (*see, e.g.*, Dkt. No. 26); preparing a motion for entry of default pursuant to the Hague Convention (Dkt. No. 19); preparing and filing the instant motion for default judgment (Dkt. No. 25); and preparing the supplementary papers for its request of attorneys' fees (Dkt. No. 30, Steele Decl.). (*See* Steele Decl. ¶ 3.) After reviewing the time records and exhibits attached to the Steele Declaration, the Court finds that there was no duplication of labor or redundancies in any of the tasks for which Facebook was billed, supporting a finding that the hours worked in this action are reasonable. Therefore, given the action's scope and nature, the Court finds that the hours for which Plaintiff was billed are reasonable.

**C. Costs**

Plaintiff seeks a total of $8,989.95 in costs. (Dkt. No. 30 at 4-5.) This total includes the $400.00 filing fee, $401.62 incurred in preparing and delivering chambers copies of court filings, $1,495.00 incurred by hand delivering initial court filings and waiver of service of process form with a cover letter, $6,669.36 paid to translate all initial court filings into Ukrainian as required by the Hague Convention, as well as for international service assistance, and $23.97 for postage for mailing the required documents to the Ukraine. (*Id.*) Given the nature of the case, specifically the requirements imposed by international service and the Hague Convention, the Court finds these costs are reasonable, and further supported by the exhibits attached to the Steele Declaration. (Steele Decl., Ex. A.) *See also Baskin-Robbins Franchising LLC v. Pena*, No. 19-CV-06657-JSC, 2020 WL 2616576, at *13 (N.D. Cal. May 7, 2020), *report and recommendation adopted*, No. 19-CV-06657-LHK, 2020 WL 2614851 (N.D. Cal. May 22, 2020) (granting plaintiffs' request for litigation costs in full, including "filing fee, process server fees, and delivery costs associated with courtesy copies to the Court" because fee requests were reasonable and supported by declaration and invoices) (internal quotations and citation omitted). As such, the costs incurred should be granted in full.

**CONCLUSION**

For the reasons set forth above, the Court recommends Plaintiff's motion for default judgment be granted and a permanent injunction issued against Defendants. Any party may file objections to this report and recommendation with the newly assigned district court judge within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Civil L.R. 72-3. Failure to file objections within the specified time may waive the right to appeal the district court's ultimate Order.

This Order disposes of Dkt. No. 25.

**IT IS SO ORDERED.**

Dated: August 28, 2020

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California